603 S.E.2d 764 (2004)
269 Ga. App. 278
In the Interest of T.G. et al., children.
No. A04A1609.
Court of Appeals of Georgia.
August 26, 2004.
*765 Mark Nathan, Savannah, for Appellant.
Thurbert Baker, Attorney General, Shalen Nelson, William Joy, Senior Assistant Attorney General, Leo Beckmann, Savannah, for Appellee.
BLACKBURN, Presiding Judge.
L.G., biological mother of two children, T.G. and T.G., appeals the termination of her parental rights in her children, contending that the evidence is insufficient to support the termination of her rights.[1] For the reasons set forth below, we affirm.
On appeal, we must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.
In the Interest of R.W.[2]
Viewed in a light most favorable to the juvenile court's disposition of this case, the record shows that on February 4, 2001, police responded to a domestic violence call at the residence of L.G. and her husband. The police officer responding to the call had responded to several other calls to the same residence in the preceding two days. Both the mother and the father were arrested for simple battery and cruelty to children; the children, T.G. and T.G., were removed from the home because no adult was available to care for them.
A petition was filed in the juvenile court by the Chatham County Department of Family & Children Services ("DFCS") in the interests of the children alleging deprivation, and a hearing was held by the court on February 20, 2001. The juvenile court heard evidence that the mother and father had been involved in at least ten incidents in which police were called. In most of the incidents, which were dramatic and violent and which occurred in houses, apartments, and cars, the children were present. By its order of March 14, *766 2001, nunc pro tunc February 20, 2001, the juvenile court found that the children were "in a state of deprivation, as defined by law," and "in need of the care and protection of the state," and transferred temporary legal custody of the children to DFCS. The juvenile court further observed:
The Court is greatly concerned about this family. There appears to be so much domestic struggle as to make any stable home life for the family impossible. The children observed the struggle even if they were not physically struck themselves. They will learn violence if they see it like this, and the Court observes that one need not lay a hand on a child to crush her spirit. These children should not be returned until these parents can demonstrate that they can behave like reasonable adults and can avoid violence.
The order also incorporated a reunification case plan. The juvenile court's order was not challenged.
A supplemental order following citizen panel review was entered on December 12, 2001. The order provided that the children were to continue in the current placement because the mother had not completed the goals of the reunification plan and problems still existed.
On January 25, 2002, the juvenile court granted DFCS's motion for extension, which alleged that the children continued to be in a deprived state and requested that the children be continued in its temporary custody and control. In granting the motion, the court found that "return to the home would be contrary to the welfare of the children and continued removal of the children from the home is in the children's best interest, because the parents have not completed the reunification plan which is designed not to return the children home until it is safe from domestic violence."
On October 22, 2002, the juvenile court issued an order, at the recommendation of a citizen review panel, that reunification of the children with a parent be pursued concurrent with the filing of a petition to terminate the parental rights of both parents. In so ordering, the court noted that the children, who had come into care due to an extensive history of domestic violence between the parents in the presence of the children, had been in care 15 of the last 22 months. The court made additional findings of fact supporting its order:
These parents have continued to feed their dysfunctional relationship throughout the time the children have been in foster care. The mother has had the father jailed and has pursued obtaining a Family Violence Ex-Parte Protective Order against the father through the Superior Court of Chatham County, which does not allow him to visit or have contact with the children. At the June Panel the parents continued to demonstrate self-centered volatile behaviors towards each other without regard to the impact their behavior has on their children. The mother became so out-of-control that intervention by law enforcement was required. The father then left prior to the conclusion of the review. All of this chaos occurred with the children present, who had been brought to the review. Even at this review hearing the parents were unable to remain separated in the waiting area, with accusations flying between them as to who was harassing whom.
The court also found that the mother admitted she had stopped taking medication prescribed for her to address her emotional and mental health issues for a period of time, though she had, at the time of the hearing, resumed the medication.
Because the mother and father had failed to comply with the reunification plan for two years and the order transferring legal custody to DFCS would soon expire, DFCS filed a new deprivation petition with the juvenile court. After a hearing on January 28, 2003, the court found that the mother and father had not complied with all requirements of the reunification plan. It noted that the couple's living arrangements had been "fluid," with several moves and a separation in the last nine months. The court also found that the mother had exhibited poor judgement: she had told the children's court-appointed special advocate ("CASA") in November 2002 that the father did not live with her when, in fact, he did; she showed the children a photograph *767 of her deceased baby which she had miscarried; and she told the children they could go home with her if they were good. The order set forth a new reunification plan requiring the mother and father to: start and continue counseling until they were successfully discharged; cooperate with a home evaluation by DFCS; communicate any changes in address, telephone number, or other living arrangements with the case manager; and visit regularly with the children and present a positive, nurturing attitude at all times during the visits. This order, too, was not challenged.
On May 20, 2003, CASA filed a report recommending termination of the mother's and father's parental rights and adoption of the children. CASA reasoned that the children had been in care for more than two years waiting for their parents to complete the reunification plan and that they should not be forced to wait any longer for a permanent home. CASA also stated that "[t]he girls' safety cannot be reasonably assured with either parent now or in the future. The parents have continued their volatile relationship without appreciation of its impact on their children." CASA added that the children were put in physical danger during the altercations between their parents, and that "[i]ncidents between the parents have been documented throughout the girls' lives and have occurred as recently as April 2003." CASA went on to state that
[b]oth parents have lied throughout the case to CASA, DFCS and the court with regard to their relationship, treatment compliance and residence. They now indicate they are separated permanently, but such declarations have been made before. The mother has even gone so far as to file for a temporary protective order against the father while continuing to reside with him.
With respect to the mother, CASA expressed concerns about her psychological stability, pointing out that she had "a history of noncompliance with treatment recommendations for bipolar disorder," that her "manic episodes put the girls at particular risk of harm," and that her "psychological evaluation and behaviors over the past two years indicate dependency issues and the tendency to provoke violent interactions have not been resolved as of yet." Finally, CASA observed that relatives had indicated that they could not provide for the safety of the girls because of the parents' conduct, noting that the maternal grandmother had offered to be a placement resource but that the children had to be removed from her home because of disruptions by the parents.
On the same day that CASA's report was made, the juvenile court held a hearing on the termination petition. On May 28, 2003, the juvenile court entered an order terminating the parental rights of both the mother and father, and it is from this order that the mother appeals.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of V.M.T.[3]
The first factor supporting a finding of parental misconduct, i.e., whether the children were deprived, has been met. The juvenile court's order of March 14, 2001, nunc pro tunc February 20, 2001, finding that the children were deprived, and the order of January 29, 2003, making the same finding of deprivation, were not appealed. The mother is, therefore, bound by the juvenile court's findings of deprivation. In the Interest of *768 J.J.[4]
As to the second factor, in determining whether the cause of the deprivation was that the children were without proper parental care and control, the juvenile court is authorized to consider the factors in OCGA § 15-11-94, two of which are applicable here. One factor is "evidence of past egregious conduct of the parent toward the child . . . of a physically, emotionally, or sexually cruel or abusive nature." OCGA § 15-11-94(b)(4)(B)(iv). And, in cases
where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: [t]o comply with a court ordered plan designed to reunite the child with the parent or parents.
OCGA § 15-11-94(b)(4)(C)(iii).
First, the mother's past egregious conduct toward her children was of an emotionally cruel and abusive nature. The children's state of deprivation was the result of their parents' continuing violent altercations, dramatic and frightening incidents indulged in with no thought for the emotional well-being and stability of the children. Second, the evidence established that the mother and the father failed to comply with the reunification plan ordered by the court for over two years. Taken together, these facts provide sufficient evidence that the children were without proper parental care and control, and that such caused their deprivation.
The evidence also shows that the deprivation is likely to continue. "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." In the Interest of R.W., supra at 524(1), 546 S.E.2d 882. As the juvenile court observed in the termination order, the mother and the father have a lengthy history of severe conflict, domestic violence, separation, and reconciliation. Both have sought counseling, failed to complete it, and then promised to seek it again. "This pattern of beginning counseling, ending counseling, and additional conflict has continued to the present time." The mother and father have separated, and then reconciled and moved in together again only to fight once again and separate. The mother has lied to the court, the guardian ad litem, and others, telling them she had separated from the father when in fact she lived with him. On January 28, 2003, the couple announced that they had moved together to a new residence, and would remain together, seek counseling, and comply with the reunification plan. They did not. These promises were broken just like the promises made in the previous two years. The juvenile court could infer from the evidence "that it is more likely that the same events will happen following this [termination] proceeding as happened before following the earlier proceedings. It is likely that the deprivation will continue because of the instability of the parents and their continued conflict."
As to the fourth factor,
the same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.
In the Interest of J.J., supra at 165, 575 S.E.2d 921. Clearly, placing these children back into a volatile environment where they are subject to sudden and violent altercations between their parents will cause mental, emotional, and moral, if not physical, harm to them.
Finally, the record supports the finding that the termination of the mother's parental rights is in the best interests of the children. "The same factors that show parental *769 misconduct or inability can support a juvenile court's finding that termination of parental rights is in the children's best interests." (Punctuation omitted.) In the Interest of J.J., supra at 166, 575 S.E.2d 921. There is no reason to believe that the mother can provide, in the near future, a safe and stable home for her children. The children have been in foster care for more than two years during which time the parents have failed to complete the reunification plan. The children should not be forced to wait any longer for a permanent home.
Judgment affirmed.
BARNES and MIKELL, JJ., concur.
NOTES
[1] The father's rights were also terminated, but he does not join in this appeal.
[2] In the Interest of R.W., 248 Ga.App. 522-523(1), 546 S.E.2d 882 (2001).
[3] In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000).
[4] In the Interest of J.J., 259 Ga.App. 159, 161-162, 575 S.E.2d 921 (2003).