## A05A0993. ROKOWSKI v. GILBERT et al.

(620 SE2d 509)

MIKELL, Judge.

Jacek Rokowski appeals from the orders terminating his parental rights to his infant daughter, S. E. R., and permitting appellees, Mark Alan Gilbert and Amy Evans Gilbert, to adopt the child. We affirm.

1. The Gilberts have moved to dismiss Rokowski's appeal from the order terminating his parental rights to S. E. R., arguing that we lack jurisdiction because the notice of appeal was filed more than 30 days after the order was entered. We disagree.

The record shows that the final hearing in this case was held on April 13, 2004; the order terminating Rokowski's parental rights was issued on May 21, 2004; and the adoption decree was entered on June 25, 2004. The notice of appeal was filed on July 14, 2004. The Gilberts argue that the termination order was a "final judgment" within the meaning of OCGA § 5-6-34 (a) (1), such that Rokowski was required to file the notice of appeal no later than 30 days following the entry of the order.[1] The Gilberts are incorrect. Our Supreme Court recently addressed this issue in *In the Interest of I. S.*[2]

> In direct appeals taken under OCGA § 5-6-34 (a) (1), appellate courts must review all rulings rendered in the case that are raised on appeal and which may affect the proceedings below, without regard to the appealability of the ruling standing alone and without regard to whether the ruling was final or appealable by some other express provision of law. Id. at (d).[3]

In addition, the notice of appeal recites that the order appealed from is the order of June 25, 2004, in which the court entered a "Final Judgment and Decree of Adoption wherein the parental rights of [Rokowski] were terminated to his minor daughter." The June 25 order references the May 21 order in which his parental rights were terminated. Based on *In the Interest of I. S.* and OCGA § 5-6-34, Rokowski's timely filed notice of appeal from the final judgment and decree of adoption gives this Court jurisdiction to consider previous orders entered in the case. The motion to dismiss the appeal of the order terminating parental rights is denied.

---

[1] See OCGA § 5-6-38.

[2] 278 Ga. 859 (607 SE2d 546) (2005) (party may challenge earlier, unappealed deprivation order in the course of a timely direct appeal from a subsequent order arising out of the deprivation proceeding).

[3] Id. at 860.

2. Rokowski argues that the order terminating his parental rights is not supported by clear and convincing evidence. We disagree.

Under OCGA § 19-8-10 (a),

> [s]urrender or termination of rights of a parent pursuant to subsection (a) of Code Section . . . 19-8-7 shall not be required as a prerequisite to the filing of a petition for adoption of a child of that parent . . . where the court determines by clear and convincing evidence that the . . . [p]arent has failed to exercise proper parental care or control due to misconduct or inability, as set out in . . . Code Section 15-11-94 [(b)], and the court is of the opinion that the adoption is in the best interests of that child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.[4]

Pursuant to OCGA § 15-11-94 (b), the court determines parental misconduct or inability by finding that the child is deprived; that lack of proper parental care by the parent in question is causing the child's deprivation; that the cause of the deprivation is likely to continue or will not likely be remedied; and that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[5]

In considering the sufficiency of the evidence supporting an order terminating parental rights, this Court views the evidence in the light most favorable to the appellees and determines whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost.[6] We defer to the trial court's findings of fact and affirm unless this standard is not met.[7] In addition, "[i]n matters of adoption the superior court has a very broad discretion which will not be controlled by the appellate courts except in cases of plain abuse. Thus, if there is any evidence to support the judgment entered in an adoption proceeding, it must be affirmed by this court."[8]

Properly viewed, the record reveals that Rokowski and S. E. R.'s natural mother, Sharon Rokowski ("Sharon"), were married on November 11, 2001, in New Mexico and that, at the time of the adoption

---

[4] OCGA § 19-8-10 (a) (4).

[5] OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

[6] *In the Interest of S. L. B.*, 265 Ga. App. 684 (595 SE2d 370) (2004).

[7] Id.

[8] (Citations and punctuation omitted.) *Johnson v. Taylor*, 153 Ga. App. 15, 16 (264 SE2d 512) (1980). Accord *Hall v. Coleman*, 264 Ga. App. 650, 652-653 (592 SE2d 120) (2003).

hearing, a petition for dissolution of their marriage was pending in that state. A male child, S. J. R., was born to the couple on September 20, 2001, and the New Mexico court permitted him to reside with his father without making a "finding . . . as to the appropriateness of the custodial arrangement." S. E. R. was born on October 3, 2003.

Sharon testified that Rokowski physically assaulted her on numerous occasions during their marriage, beginning in January 2002. She was drinking during each incident. According to Sharon, during the first assault, Rokowski punched her in the face, threw her on the stairs, and broke her rib. She was unable to leave the house for a week and a half. At first, the abuse occurred every two months; then it progressed to every six weeks, to once a month. All the beatings took place in the presence of S. J. R. and Sharon's other two young children by a different father. The two stepchildren, then aged five and seven, were removed from their household on August 6, 2002, and adopted by a relative of Sharon.

Sharon testified that, in addition to abusing her, Rokowski beat and punched their two Labrador puppies and left them chained to poles for long periods of time and that he threw their cats into a pond. Sharon also testified that he threatened to kill her parents and that they have restraining orders against him.

According to Sharon, when her husband beat her again on December 23, 2002, she called the district attorney. However, after Rokowski threatened her, Sharon dropped the charges. Also, at some point in 2002, Rokowski threw her out of the house. She was unable to return because he smashed all of her belongings. Rokowski admitted that he "[b]usted everything that belonged to her" because he was "very angry."

Next, when Sharon informed her husband that she was pregnant in the spring of 2003, Rokowski told her to have an abortion because they could not care for two children. At that time, S. J. R. lived with Sharon. One evening, Rokowski came to Sharon's makeshift home and tried to take S. J. R. Rokowski cornered Sharon and kicked her in the back several times while she was on the floor, telling her he hoped that she would miscarry. He denied kicking her but admitted that he urged her to have an abortion because he was concerned about the effect of her drinking on the unborn child.

Sharon testified that when she went into labor, she called Rokowski and asked him to drive her to the hospital. He drove to her residence, put S. J. R. in his car and drove off, leaving her stranded. Sharon's Alcoholics Anonymous sponsor drove her to the hospital. S. E. R. was born an hour later; she was five weeks premature and suffered from fetal alcohol syndrome. Sharon testified that Rokowski called her the next day and said he did not want to see the baby because he would not take part in raising her. She also testified that

Rokowski never provided her or the baby with financial support. According to Sharon, Rokowski stated that he wanted S. E. R. placed in foster care. He was against the adoption because he hoped someday to be able to be a fit parent for her.

S. E. R. remained in the hospital for over two months. Rokowski testified that he visited S. E. R. in the hospital three times and brought S. J. R to meet her. He introduced into evidence a videotape he took of S. E. R. the day before she was released from the hospital. However, Rokowski admitted that during the entirety of his daughter's hospital stay, he never spent the night with her because he had to work full time. He was self-employed earning $16,000 per year. Rokowski admitted that he has never paid a dime for the support of the child, although he has paid $7,000 in attorney fees and travel expenses to fight for his parental rights. He claimed he was never given a chance to support the baby because she was "kidnapped" from the hospital. Rokowski admitted that he did not sign the child up for Medicaid; did not pay any medical expenses associated with her hospital stay; and does not have health insurance, either for himself or the baby. Finally, he admitted that he told the Gilberts' lawyer that if they helped him with S. J. R., Rokowski would sign the adoption papers for S. E. R.

Amy Gilbert testified that she agreed to adopt S. E. R. immediately after her birth and traveled to New Mexico to meet her when she was four weeks old. S. E. R. was in the newborn intensive care unit of a children's hospital, being fed through a tube in her nose. Mrs. Gilbert stayed for five days during that first visit and never saw Rokowski. She returned to New Mexico while S. E. R. was still in the hospital. At that time, the baby still could not swallow but had gained enough weight for a feeding tube to be inserted into her stomach. S. E. R. was finally released from the hospital on or about December 6, 2003, and Mrs. Gilbert brought her back to Valdosta on December 11. Mrs. Gilbert, a homemaker with three other children, aged seven, five, and four, fed S. E. R. through the feeding tube every three hours and took her to a variety of specialists, including an eye doctor, who prescribed glasses for the infant to help her eyes focus; and a pediatric neurologist, who referred her to a geneticist. In addition, Mrs. Gilbert testified that S. E. R. has clogged tear ducts, which have to be massaged several times daily; that a speech therapist and an occupational therapist come to her home a total of three times per week; that she takes S. E. R. to the doctor twice a month, administers two medications daily, and massages her body to assist in her development. Mrs. Gilbert further testified that her husband, a practicing attorney, has borne the entire cost of the infant's medical care. Finally, she testified that her family has bonded with the child; that she and her husband wish to adopt her; and that they are able to

financially support the child. On cross-examination, Mrs. Gilbert admitted receiving a letter from Rokowski demanding the return of S. E. R. However, she further testified that he never tried to visit the child.

Based on the foregoing evidence, the trial court terminated Rokowski's parental rights to S. E. R. He argues that the trial court erred in finding by clear and convincing evidence (a) that lack of proper parental care on his part was the cause of S. E. R.'s deprivation; (b) that the cause of the deprivation was likely to continue or would not likely be remedied; and (c) that termination of his parental rights was in the child's best interest.

(a) OCGA § 15-11-94 (b) (4) (B) provides that, in determining whether lack of proper parental care is the cause of a child's deprivation, "the court shall consider, *without being limited to*," six factors, including "evidence of past egregious conduct of the parent toward the child . . . of a physically, emotionally, . . . or abusive nature" and "[p]hysical, mental, or emotional neglect of the child."[9] Evidence of both factors is present in this case. Rokowski sought the unborn child's demise by urging his wife to have an abortion and by repeatedly abusing her while she was pregnant in the hopes that she would miscarry. Rokowski refused to take his wife to the hospital to ensure the child's safe birth. Rokowski's unrepentant bad temper and violent propensities resulted in egregious conduct toward the unborn child as well as other family members.[10] Other children in the home were exposed to repeated episodes of domestic violence so severe that two of them were removed from the home. In addition, the evidence supports a finding that Rokowski neglected S. E. R. after she was born. There is evidence of only one visit during the entire time she was hospitalized in intensive care. Moreover, although he demanded that Mrs. Gilbert return the child, he never attempted to visit her.

Further, the court was not limited to the statutory factors and properly considered Rokowski's refusal to provide financial assistance of any kind for the child, who had incurred substantial medical expenses. "A father's failure to support his child . . . is compelling evidence that the father is not an able parent."[11] Sufficient evidence

---

[9] (Emphasis supplied.) OCGA § 15-11-94 (b) (4) (B) (iv), (v).

[10] See *In the Interest of J. T. W.*, 270 Ga. App. 26, 33 (2) (b) (606 SE2d 59) (2004) (parental misconduct shown by allowing domestic violence in the home and by failing to provide for child's medical needs); *In the Interest of T. G.*, 269 Ga. App. 278, 283 (603 SE2d 764) (2004) (parents' violent altercations caused deprivation); *In the Interest of F. G.*, 233 Ga. App. 153, 154 (1) (a) (503 SE2d 387) (1998) (father's severe abuse of his partner's child a factor in the termination of his rights to his biological children).

[11] (Citation omitted.) *In the Interest of T. B.*, 267 Ga. App. 484, 486-487 (1) (600 SE2d 432) (2004).

was presented to support a finding that a lack of proper parental care or control caused the deprivation found in this case.

(b) Rokowski argues that the evidence is insufficient to show that the cause of the deprivation is likely to continue or will not likely be remedied. "A finding of parental unfitness must be based on present circumstances."[12] He argues that, because he is presently employed and provides a stable home for his other child, S. J. R., that the cause of S. E. R.'s deprivation is not likely to continue if she is returned to his care. We disagree. First, the evidence shows that the New Mexico court has made no finding regarding the propriety of awarding custody of S. J. R. to either parent. Rather, the court ordered a "priority consultation" to determine whether or not "[S. J. R.] is safely and appropriately in his father's care or if he should be in his mother's care." Second, and more significantly, Rokowski has demonstrated no ability to care for a child with S. E. R.'s medical complications. He testified that, although he obtained copies of her medical records, he was not aware of her condition, and he did not know whether his son's daycare providers have any special medical training that would enable them to care for S. E. R.'s daily needs. When questioned about the daycare center, Rokowski testified, "I know they handle very young children." Sufficient evidence was presented to support a finding that his inability to parent a special needs child would not likely be remedied.[13] In addition, a court may consider past conduct of a parent in deciding whether deprivation is likely to continue.[14] Rokowski's past parental misconduct, including his history of violence and neglect of S. E. R.'s needs, support a finding that the child's deprivation would likely continue if she were returned to him.[15]

(c) Finally, the evidence clearly and convincingly shows that termination of Rokowski's parental rights, and adoption by the Gilberts, is in S. E. R.'s best interest, after considering her physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.[16] "The same factors that show parental misconduct or inability can support a . . . court's finding that termination of parental rights is in the [child's] best interests."[17] It can be inferred from Rokowski's testimony that he is unable or

---

[12] (Punctuation and footnote omitted.) *In the Interest of L. J. L.*, 247 Ga. App. 477, 480 (543 SE2d 818) (2001).

[13] See *In the Interest of J. T. W.*, supra.

[14] *In the Interest of T. B.*, supra at 486.

[15] Id. at 487.

[16] OCGA § 19-8-10 (a) (4).

[17] (Citation and punctuation omitted.) *In the Interest of M. E. M.*, 272 Ga. App. 451, 455 (612 SE2d 612) (2005).

unwilling to provide the type of extraordinary care this child requires. On the other hand, there is evidence that the adoptive parents have provided and are willing and financially able to continue to provide the constant care and medical attention S. E. R. needs. Sufficient evidence was presented to support a finding that termination of Rokowski's parental rights, and adoption by the Gilberts, is in S. E. R.'s best interest.

3. Rokowski next asserts that the trial court should have dismissed the adoption petition because the Relinquishment of Parental Rights and Consent to Adoption executed by Sharon in New Mexico did not substantially comply with Georgia law.

In this regard, OCGA § 19-8-7, which governs relative adoptions, states that the surrender of parental rights must meet the requirements of OCGA § 19-8-26. Rokowski argues that the relinquishment signed by Sharon was defective because it did not notify her that she had ten days to withdraw her consent; did not contain an acknowledgment of surrender of parental rights; did not contain the mother's affidavit; and did not identify the Gilberts as the proposed adoptive parents.[18] Rokowski points out that "[a]doption statutes should be strictly construed and meticulously followed so that beyond all peradventure the adoption will not later be subject to attack."[19] But in the case at bar, the trial court correctly determined that the relinquishment was valid because it was knowingly and voluntarily made in accordance with New Mexico law[20] and was confirmed by Sharon's testimony during the adoption hearing.

The relinquishment was entitled to full faith and credit. The relevant statute, OCGA § 24-7-24 (b), provides that "the records and judicial proceedings, or copies thereof, of any court . . . of any . . . [other] state . . . may also be proved or admitted in any court . . . in this state when certified under the hand and seal, if any, of the judge, clerk, or other official of such court." The document in this case bears a "Certification of Relinquishment" signed and dated by a district court judge. Although the document does not state that it was certified under the judge's "hand and seal," "[b]y use of the language 'if any,' the statute itself contemplates that every court may not certify documents under 'hand and seal.' "[21] Rokowski neither challenges

---

[18] See OCGA §§ 19-8-26 (c), (g), (h); 19-8-7 (a).

[19] (Citation and punctuation omitted.) *Johnson v. Smith*, 251 Ga. 1, 2-3 (2) (302 SE2d 542) (1983).

[20] See NMSA 1978 § 32A-5-21.

[21] *Morrison v. State*, 272 Ga. App. 34, 44 (8) (a) (611 SE2d 720) (2005).

the document's compliance with New Mexico law nor counters the Gilberts' argument that the relinquishment was entitled to full faith and credit.[22]

Finally, Sharon reiterated during her testimony that she had surrendered her parental rights to the child in New Mexico and that it was her continued desire to do so. Sharon testified that she executed the surrender voluntarily and with the assistance of an attorney and a counselor with an adoption assistance agency. Sharon further testified that she agreed to the surrender because she was an alcoholic, unemployed, and knew that she could not care for the child. S. E. R. was born with fetal alcohol syndrome. Social services informed Sharon that neither she nor her husband, Rokowski, could take the baby home from the hospital due to prior domestic violence in the home. Sharon then decided to surrender the infant to her brother, Mark Gilbert, and his wife, Amy. Sharon's affirmation at the final hearing of her intention to surrender S. E. R. to the Gilberts cured any alleged defect in her relinquishment.[23]

Rokowski relies on cases in which the parent who executed the surrender subsequently challenges its validity. For that reason, they are distinguishable.[24] Nor does *Spires v. Tarleton*[25] mandate a contrary result. In that case, we held that the petitioners' failure to attach or explain the absence of several documents required for a stepparent adoption necessitated dismissal of the adoption petition.[26] In the case at bar, however, the mother's surrender complied with New Mexico law.

*Tyson v. Dept. of Human Resources*[27] is similarly inapposite. There, the surrender was fatally defective because the person named as the natural mother's relative in the release form was not actually a relative, and this person "assigned" her adoption rights to a third party.[28] The Department of Human Resources, which did not consent to the adoption, moved to dismiss the petition, and the natural mother did not testify.[29] These circumstances are not present in the case at bar. The relinquishment shows that Sharon surrendered her rights to an adoption agency "so that the child may be placed for

---

[22] The Gilberts argue that the document is entitled to recognition under OCGA § 19-8-22 (a), which requires courts in this state to recognize decrees of foreign courts "terminating the relationship of parent and child." Because there is no admissible evidence of record that the relinquishment is a termination order, we decline to apply this statute.

[23] *In re Stroh*, 240 Ga. App. 835, 841 (1) (a) (ii) (523 SE2d 887) (1999).

[24] *Johnson v. Smith*, supra at 2 (2); *Nelson v. Taylor*, 244 Ga. 657 (261 SE2d 579) (1979).

[25] 225 Ga. App. 117 (483 SE2d 337) (1997).

[26] Id. at 118 (1).

[27] 165 Ga. App. 414 (301 SE2d 485) (1983).

[28] Id. at 414-415.

[29] Id. at 415.

adoption with an agreed upon family." Although a counseling affidavit executed before the relinquishment was signed reflects that Sharon initially selected a different family, nothing in the relinquishment itself refers to the alternate family. In addition, the record shows that the adoption agency placed S. E. R. with Amy Gilbert on December 6, 2003. Accordingly, the trial court did not err in ruling that the relinquishment was a valid surrender of parental rights.

4. Rokowski next contends that the adoption is invalid because the petition did not comply with the Interstate Compact on the Placement of Children ("ICPC").[30] The trial court held that the ICPC did not apply to this adoption pursuant to Art. VIII, which states: "This compact shall not apply to: (a) The sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state." The transcript shows that S. E. R. was brought to Georgia by Amy Gilbert, her adult aunt by marriage, on December 11, 2003, and has resided with the Gilberts since that time. Thus, the trial court correctly held that the ICPC does not apply to this adoption pursuant to the exclusion set out above.

5. Rokowski alleges that the adoption decree is invalid because he was not served with the petition for adoption at least 30 days prior to the hearing pursuant to OCGA § 19-8-11 (a). Rokowski was served in New Mexico on March 23, 2004, and the hearing was held 20 days later, on April 13. The trial court held that Rokowski waived the notice requirement by refusing an offer made by Sharon's counsel to reopen the evidence, permit additional discovery, and continue the hearing for 30 days. We agree.[31] Moreover, Rokowski waived the defense by failing to assert it in his answer or at the hearing.[32] The answer raises as an affirmative defense lack of compliance with OCGA § 19-8-12, but that Code section applies to a biological father who is not a legal father. Rokowski was S. E. R.'s legal father because he was married to Sharon when S. E. R. was born.[33] The trial court did not err in finding that Rokowski waived the right to 30-day notice of the hearing.[34]

---

[30] OCGA § 39-4-4.

[31] Compare *McKinney v. Jennings*, 246 Ga. App. 862, 863 (2) (542 SE2d 580) (2000) (decree of adoption vacated and case remanded for a hearing in accordance with pre-2003 version of OCGA § 19-8-14).

[32] OCGA § 9-11-12 (g), (h).

[33] See OCGA § 19-8-1 (6) (B).

[34] See, e.g., *In the Interest of D. R. W.*, 229 Ga. App. 571, 574 (2) (494 SE2d 379) (1997) (failure to challenge sufficiency of service of petition for termination of parental rights constituted waiver).

6. Rokowski next contends that the trial court erred in proceeding with the final hearing prior to ruling on the legal sufficiency of the adoption petition.

The record reflects that the trial court heard extensive argument on Rokowski's objections to the legal sufficiency of the adoption petition and decided to take the matter under advisement rather than ruling from the bench. At the court's request, the parties submitted letter briefs after the hearing. On May 21, 2004, the court entered a separate order denying Rokowski's motion to dismiss the petition. Rokowski argues that the court's procedure violated OCGA § 19-8-18 (c), which provides:

> If the court determines that any petitioner has not complied with this chapter, it may dismiss the petition for adoption without prejudice or it may continue the case. Should the court find that any notice required to be given by any petitioner under this chapter has not been given or has not been properly given or that the petition has not been properly filed, the court is authorized to enter an order providing for corrective action and an additional hearing.[35]

We find that the court's decision to take the matter under advisement was well within its discretion pursuant to this Code section.

7. Rokowski next argues that the trial court lacked subject matter and personal jurisdiction over S. E. R. due to a pending divorce action in New Mexico. In this regard, the record shows that Rokowski filed a petition for dissolution of marriage against Sharon on February 10, 2004. Rokowski sought custody of both children but averred that S. E. R. resided with the Gilberts in Valdosta. The New Mexico court declined to exercise jurisdiction over S. E. R., and the trial court found that, because the child had been brought into Georgia by a relative, the ICPC does not apply. The court also correctly noted that the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which applies to interstate custody disputes, does not apply to adoption proceedings.[36] The applicable Code section, OCGA § 19-8-2, grants exclusive jurisdiction to superior courts in all adoption proceedings, and makes venue proper in the county in which the adopting parents reside.[37] The trial court did not err in ruling that it had subject matter and personal jurisdiction.

---

[35] OCGA § 19-8-18 (c).

[36] OCGA § 19-9-42.

[37] *Spires v. Bittick*, 171 Ga. App. 914 (1) (321 SE2d 407) (1984) (decided under former OCGA § 19-8-1).

8. Rokowski further complains that the trial court erred in proceeding with a hearing on the Gilberts' request to terminate his parental rights because their petition did not include a specific prayer for such relief. This assertion is belied by the record. The relief was specifically requested in paragraph D of the prayer for relief. Furthermore, the "Summons and Process" served on Rokowski quotes OCGA § 15-11-93, which describes the effect of an order terminating parental rights, in its entirety, and notifies him that a petition has been filed concerning S. E. R. This enumeration is meritless.

9. Finally, Rokowski argues that the adoption decree should be reversed because the trial court erroneously permitted the Gilberts to file six affidavits of witnesses who did not testify.[38] Rokowski contends that these affidavits amounted to hearsay which was used to bolster the testimony of the Gilberts' witnesses. Prior to the hearing, Rokowski filed a written objection to the admission of these affidavits based in part on Uniform Superior Court Rule (USCR) 24.5. USCR 24.5 permits the filing of witness affidavits in temporary hearings in domestic relations actions, provided the affidavits are served on opposing counsel at least 24 hours prior to the hearing. Rokowski argued that because the hearing was a final hearing, the affidavits were inadmissible. Rokowski reasserted his objection at the hearing, and interposed a hearsay objection as well. The trial court stated that it would consider the objection but did not issue a ruling.

"Adoption" is contained within the title "Domestic Relations" in the Georgia Code. Therefore, USCR 24.5 applies to adoption proceedings. As the hearing in the instant case was a final one, the affidavits were inadmissible. In addition, the affidavits were hearsay, and "it is well settled that hearsay lacks probative value, even if unobjected to."[39] However, "[t]here is no reversible error where the evidence introduced (not including the hearsay) is sufficient to support the findings of the trial judge."[40] In the case at bar, the only order in which the trial court states that it relied on affidavits was the order terminating Rokowski's parental rights, and virtually all findings of fact contained in that order are supported by live testimony, as we recognized in Division 2. Therefore, we hold that the evidence, excluding the inadmissible affidavits, supported the findings necessary to terminate the father's parental rights. Accordingly, there was no reversible error.

---

[38] A seventh affidavit was filed after the hearing but it does not appear that the court considered it.

[39] (Footnote omitted.) *In the Interest of E. C.*, 271 Ga. App. 133, 135 (1) (609 SE2d 381) (2004).

[40] (Citations omitted.) *In the Interest of O. J.*, 257 Ga. App. 1, 4 (2) (570 SE2d 79) (2002) (construing OCGA § 15-11-56 (a)).

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED AUGUST 31, 2005 —

Vernita L. Lee, for appellant.
Silvis, Ambrose & Lindquist, Douglas K. Silvis, Chris E. Ambrose, Smith, Hannan & Parker, David A. Parker, for appellees.